**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO. JKB-18-0506** |
| **DAYON BAILEY,** | |
| **Defendant.** | |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF
DEFENDANT'S PRETRIAL DETENTION**

Defendant Dayon Bailey, a drug trafficker and possessor of numerous firearms, seeks his release pending trial. *See* ECF 206. Bailey is a high-level drug trafficker with access to firearms and a history of poor performance under court supervision. In the instant case, Bailey eluded prosecution for over a year before he was arrested in a residence where he kept firearms and drugs. Under the Bail Reform Act, armed recidivist drug dealers who repeatedly violate the terms and conditions of their probation and flee from prosecution simply are not candidates for release.

The defendant relies on the speculative prospect of a COVID-19 outbreak at Chesapeake Detention Facility ("CDF"), the pretrial facility where he currently is housed. Yet neither Bailey nor any other detainee at CDF has been diagnosed with or exposed to COVID-19. Further, CDF administrators and staff have established comprehensive precautionary measures to previse transmission of COVID-19 into CDF. Moreover, Bailey's requested relief would place an untenable strain on the resources of the Pretrial Services Office and the Court. In light of those measures, and given the medical resources to which the defendant has access at CDF, the Court should conclude that Bailey's continued detention is necessary to protect the public, and that the

1

emergence of COVID-19 is not a card to be played by armed drug traffickers who wish to get of jail.

## BACKGROUND

The defendant is charged in four counts of a five charged indictment filed on October 3, 2018. The first count charges the defendant with conspiring to distribute 500 grams or more of cocaine, 100 grams or more of heroin, 28 grams or more of cocaine base, 100 grams or more of heroin and an unspecified quantity of fentanyl, in violation of 21 U.S.C. § 846, which carries a sentence ranging from 5 years to 40 years of imprisonment.  Count Two charges the defendant with possession with intent to distribute the above-described substances. The defendant is charged in Count Four with Possession of Firearms in Furtherance of a Drug Trafficking Crime in violation of 18 U.S.C. § 924(c). Specifically, the charge points to three separate firearms that the defendant possessed in furtherance of drug trafficking. Lastly, the defendant is charged in Count Five with a violation of 18 U.S.C. § 922(g) for possessing the above-mentioned firearms though he was prohibited to do so.  The defendant made his initial appearance on May 16, 2019. On May 17, 2019, the defendant consented to detention. The defendant filed an emergency motion for release from custody on March 18, 2020. The defendant has not yet had a detention hearing.

## ARGUMENT

Despite his serious health conditions, the defendant poses a grave danger to the community and represents a serious flight risk. Accordingly, even during this pandemic, the defendant must be detained pending trial.

### I.   The Defendant Ignores Nearly All of the Section 3142(g) Factors, Which Weigh Heavily in Favor of Detention

The defendant's arguments for release focus exclusively on the COVID-19 outbreak. Indeed, his motion ignores the factors a court must consider in determining whether a defendant

poses a danger to the community.  These factors include: "(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a . . . a controlled substance [or] firearm; (2) the weight of the evidence against the person; (3) the history and characteristics of the person . . . ; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release."  18 U.S.C. § 3142(g).  Because of the nature of the charges against Bailey, the Government also is entitled to a presumption that no combination of release conditions will assure the safety of the community.  *See* 18 U.S.C. § 3142(e)(3)(A).

In this case, an examination of the § 3142 factors, which Bailey ignores, demonstrates that the defendant should be detained before trial.

### A.  The Nature and Circumstances of the Offenses

In late 2017 and early 2018, members of the Baltimore County Police Department ("BCPD") investigated Bailey and his co-conspirators who were members of a Drug Trafficking Organization (DTO) operating in Baltimore County, Maryland and elsewhere.   In connection with their investigation, BCPD obtained a search warrant for 10508 Cascade Run Court, Baltimore County, Maryland. The warrant was authorized by a Baltimore County Judge. The defendant and one of his co-conspirators were the target of the search warrant. On February 23, 2018, investigators observed the defendant exit 10508 Cascade Run Court at 10:30 a.m.   When investigators executed the search warrant at about 3:00 p.m. on February 23, 2018, they uncovered significant quantities of drugs, money and firearms from the defendant's bedroom as outlined in the below chart:

| Bedroom 1 - Dayon Bailey's Room | Chemical Analysis |
|---|---|
| Money | |
| $137,538 | |
| Guns/Ammo | |

| Bushmaster XM15 AR-15 (Bedroom Closet in Case) | |
|---|---|
| 2 Loaded AR-15 30 round Magazines (60 Bullets) (In Case) | |
| Ammo Can containing 30 round AK-47 Magazine, Shotgun Ammo, 7.6 Ammo | |
| AK-47 Assault Rifle (S.N. Romarm) (On Floor against Wall) | |
| 100 Round Drum Loaded (In AK-47) | |
| Box of 5.56 Ammo (Third Dresser Drawer) | |
| **Drugs** | |
| Bag of off White Powder (On floor in black duffel bag) | 19.92 g. of Heroin and Fentanyl |
| 8 Baggies of White Rock Substance (Closet Floor in Shoe Box) | 507.66 g. Cocaine Hydrochloride |
| 2 Bags of White Rock Substance (Top Dresser Drawer) | 27.22 g. Heroin |
| Bag of CDS (Second Dresser Drawer) | 148.78 g. Heroin |
| Two Bags Containing Bags of White Rock Substance (Third Dresser Drawer) | 6.11 g. Cocaine Base |
| CDS on Plate (Under Bed) (See Accompanying Scale in "Para") | 1.27 g. Heroin |
| **Indicia of Occupancy** | |
| Documents in Dayon Bailey's Name (In Safe under TV Stand) | |
| Photos (Second Dresser Drawer) | |
| Prescription Bottle to Dayon Bailey (Third Dresser Drawer) | |
| Papers and Photos (Top Dresser 2) | |
| Residency Papers (On top of Dresser 1) | |

From the kitchen inside of the Cascade Run apartment, investigators recovered:

| Kitchen |
|---|
| **Guns/Ammo** |
| Sig Sauer P220 .45 Caliber Handgun (Kitchen Cabinet) |
| **Paraphernalia** |
| Large Sifter (Kitchen Sink) |
| Pyrex Glass Container (Kitchen Sink) |
| Knife (Kitchen Sink) |
| Pot With White Powder Residue (Kitchen Stove) |
| Plastic Container With White Powder Residue (Kitchen Cabinet) |
| Heat Sealer Bag Containing Plant Material (Living Room Closet) |

The defendant was not home at the time the warrant was executed. Bailey's co-defendant,[1] however, entered the apartment building as BCPD executed the warrant and was arrested by BCPD.  From the co-defendant's room, BCPD recovered, among other things, $30,700, a bag of .45 caliber ammunition, a loaded .40 caliber extended magazine and over forty grams of cocaine base. As the Court is well aware, DTOs like the one Bailey helped manage are responsible for hundreds of deaths in Baltimore each year, either as a result of violent acts committed by DTO members or overdose deaths suffered by the DTO's customers from deadly substances including heroin and fentanyl which the defendant possessed in his own bedroom.

The next day, Bailey's co-defendant called Bailey from jail. The call, which took place on February 24, 2018 at 9:59 a.m., was recorded.  Below are relevant excerpts from the recorded conversation:

> Co-Defendant: I ain't gonna say to much, but that spot got touched."
> Bailey: "The house shit?"
> Co-Defendant: "straight up"
> Bailey: "you're playing"
> Bailey: "So they went after everything else?"
> Co-Defendant: "The place got cleaned out"
> Bailey: "I had like"…starts to count on the phone and says "I had about 100",
> Co-Defendant: "I am charged with three ratchets and a whole bunch of work"

Based on their analysis of these jail calls, investigators concluded that Bailey and his co-defendant discussed the co-defendant's arrest and the contraband that the police seized from the Cascade Run apartment. Importantly, it is clear evidence that Bailey had notice that he was wanted for his involvement in the DTO.  Indeed, a second phone call on February 24, 2018 at 10:05 a.m. underscores the defendant's knowledge of his pending criminal charges. To begin the

---

[1] The case against Bailey's co-defendant remains sealed.

conversation, the co-defendant read his State charging documents to Bailey, including the subjects and locations named in the search warrant. The following conversation then took place:

> Bailey: "Yo, that's why they put us out, yo but they wanted to hit the place before we left out"
> Co-Defendant: "They got so much shit on there." (Referencing the charging paperwork)
> Bailey: "I can imagine yo"

The co-defendant then informed the defendant that he was detained without bail and was just coming from a bail hearing before the commissioner. The two then continued their discussion:

> Bailey: "We just got the new spot, we should have got the fuck out of there"

Importantly, the references to "us" and "we" in the above-conversation demonstrate Bailey's conspiratorial link to his co-defendant and his dominion and control over the Cascade Run apartment and the drugs and firearms. Lastly, a third conversation on February 24, 2018, at 10:50 a.m., demonstrates that Bailey was, in fact, a knowing fugitive from justice:

> Bailey: "Did you talk to her already?"
> Co-Defendant: "Who?"
> Bailey: (no response) [which investigators believe is Bailey indicating that he doesn't want to say the name over the phone.]
> Co-Defendant: "The only person I talked to was Jas just a while ago. We are going to have to get up on that bitch and make her control the whole situation you feel me, whatever a nigga wants then, tell her to go do it, you do this, you do that, fuck, you gonna have to run, run, run around.  No need to have you go up that hill and do this.

Investigators believe that the statements, "you gonna have to run, run, run around" were references to the defendant's need to flee from justice while continuing the DTO's activities.

BCPD began searching for Bailey who remained a fugitive from justice for more than one year. That investigation revealed that, on the date of his co-defendant's arrest, the defendant flew to California. From California, he rented a vehicle and travelled to Denver, Colorado. Thereafter, investigators were unable to ascertain his location. On May 16, 2019, investigators determined Bailey was residing at 4426 Cedar Garden Run, Baltimore, Maryland. Members of the United States Marshal Service (USMS) entered the residence and placed the defendant under arrest,

pursuant to a federal arrest warrant. USMS conducted a security sweep and located a black Taurus .45 caliber handgun, bearing serial number NDR42208, in the sofa next to an air mattress next to where the defendant was sleeping.

Later on May 16, 2019, USMS applied for and obtained a warrant to search 4426 Cedar Garden Run, Baltimore, Maryland. Said search warrant was authorized by United States Magistrate Judge J. Mark Coulson. Investigators then executed the search warrant and recovered the following: a loaded Rossi .38 caliber revolver, bearing serial number D304554; approximately 265 grams of cocaine; approximately 136 grams of cocaine base; and approximately 37 grams of fentanyl. To be clear, the defendant is not yet charged in federal court for this conduct.

All of this evidence demonstrates that the defendant is a profound danger to the community. For purposes of the bail statute, the concept of dangerousness includes "the danger that the defendant might engage in criminal activity to the detriment of the community." *United States v. Millan*, 4 F.3d 1038, 1048 (2d Cir. 1993); Notably, danger to the community includes "the harm to society caused by (the likelihood of continued) narcotics trafficking." *United States v. Leon*, 766 F.2d 77, 81 (2d Cir. 1985); *see also* <u>United States v. Stone</u>, 608 F.3d 939 (6th Cir. 2010); *United States v. Hare*, 873 F.2d 796, 798–99 (5th Cir.1989) (courts may consider the legislative finding by Congress that those who commit drug-trafficking offenses pose a special risk of flight and a special danger to the community); *United States v. Townsend*, No. 1:10MJ90–1, 2010 WL 2607144 *2 (M.D.N.C. June 25, 2010) (discussing the "statutorily-mandated importance" of those offenses explicitly identified by Congress in 18 U.S.C. § 3142(g)(1), including controlled substance offenses).

## B.  Weight of the Evidence

Investigators took multiple enforcement actions directed at the defendant.  As discussed above, officers seized substantial quantities of narcotics and firearms from Bailey's residences. To

be sure, the defendant is not yet charged with the May 2019 possession of the drugs and firearms. Indeed, at least one court has suggested that the weight of the evidence is "one of the most important factors to consider." *See United States v. English*, 629 F.3d 311, 317 (2d Cir. 2011) (reciting district court's basis for detention, which had rejected defense counsel's suggestion that the weight of the evidence was "not an important factor"). *See, e.g., English*, 629 F.3d at 318 (affirming district court's decision to detain the defendant, noting the district court's finding that the evidence in the matter was extraordinarily strong and the potential sentence the defendant faced gave "an extraordinary incentive to flee" which "over[came] virtually any tie to the community").

As a result of the above-described investigation, the evidence against the Defendant is strong. *See United States v. Dyer*, No. 5:13-CR-00107, 2013 WL 2898324, at *2 (S.D.W. Va. June 13, 2013) (ordering detention where evidence in "presumption" narcotics case was "strong"); *see also United States v. Boyd*, 29 F. Supp. 3d 658, 661 (E.D.N.C. 2014) (ordering detention in part because the weight of the evidence against the defendant was "compelling"). This particular evidence weighs heavily in favor of the Defendant's pre-trial detention. *See* 18 U.S.C. § 3142(g)(1) and (2).

### C.  Risk of Flight

The Bail Reform Act also allows the court to order detention if the defendant poses a serious risk of flight. 18 U.S.C. § 3142(f).  With respect to each defendant's risk of flight, which is also not mentioned in the defendant's filing, the Government submits that the Court can and should properly consider that the defendant faces a minimum mandatory sentence of five years of incarceration and a maximum sentence of 40 years of imprisonment in connection with the drug charges. 21 U.S.C. § 841(b)(1)(A)(ii). Further, the defendant faces a consecutive term of at least five years of imprisonment if convicted of the charges under 18 U.S.C. 924(c). This is in addition to the fact that the defendant eluded apprehension for more than one year knowing that he was the

8

515dd816d5c74bf3

subject of a BCPD investigation. During that time, the defendant continued his drug trafficking and possession of firearms. Furthermore, the BCPD investigation demonstrated that the defendant traveled to Denver, Colorado and California, thousands of miles from Maryland, while continuing communication with his co-defendant as described above.

### D.   History and Characteristics of the Persons

Bailey has a lengthy criminal record and a history of poor adjustment to community and court supervision. His criminal convictions date back to 2004, when the defendant was 19 years old. His first conviction from October 27, 2004 was for firearms related offenses – a similar charge to the case at the bar.  In 2009, at age 24, the defendant was convicted of a Controlled Dangerous Substance offense, specifically, Possession with Intent to Manufacture drugs – again, a similar charge to the instant case. In that case, the defendant was sentenced to four years of incarceration with a large portion of the sentence suspended. Thereafter, the defendant was the subject of several probation violation warrants, which culminated in the unsatisfactory termination of his supervised probation in 2012. Undeterred, the defendant was next convicted on December 14, 2013 of conspiracy to distribute narcotics – yet another similar charge to the instant case. In 2017, the defendant received a summons to appear on a Baltimore County traffic case and failed to appear in March 2018, when, as described above, he was a fugitive from justice.

It is clear from Bailey's record that the defendant has been undeterred by his prior criminal adjudications in fact escalating to large-scale drug trafficking and firearms possession.

### E.  The Nature and Seriousness of the Danger to the Community in the Event of the Defendant's Release

Bailey is a recidivist.  He has not stopped, nor will he stop, dealing drugs and carrying guns.  He will not comply with court-ordered supervision.  If he were placed on location monitoring, there is little to stop him from continuing his drug business or simply deciding to flee,

again.  A substantial risk therefore exists that in the event of Bailey's release he would continue to operate his DTO either personally or through intermediaries.

## II.     Officials Have Established Comprehensive Health Measures at CDF to Avoid a COVID-19 Outbreak

Bailey himself does not contest this analysis, focusing instead on the health risks posed by the COVID-19 outbreak.  To be sure, the Bail Reform Act instructs courts to consider the "physical and mental health" of the defendant as one of the factors in its analysis.  18 U.S.C. § 3142(g)(3)(A).  Notwithstanding the COVID-19 outbreak, that factor does not weigh heavily, if at all, in favor of Bailey's release.  Currently, there are no cases of COVID-19 at CDF.  Bailey acknowledges he does not have COVID-19.  He does not allege that he has been exposed to any individuals with COVID-19.  In this way, he is not seeking release based on his *actual* "physical and mental health."  Instead he relies solely on the *possibility* of becoming infected.  As discussed below, however, CDF has implemented substantial precautionary measures to mitigate this risk.[2]

### A. Comprehensive Precautionary Measures Have Been Instituted at CDF to Avoid a COVID-19 Outbreak

The Maryland Department of Public Safety and Correctional Services ("DPSCS") has established a comprehensive set of precautionary measures to limit the risk of COVID-19 transmission into and inside CDF.[3]  DPSCS is committed to providing all necessary precautionary measures and supportive therapies to avoid an outbreak of COVID-19, including taking all of the

---

[2] The following individuals provided information about the health measures that have been established at CDF: (1) Gary McLhinney, DPSCS Assistant Secretary; (2) Sharon Baucom, DPSCS Director of Clinical Services; (3) Sterling Johnson, Supervisors, USMS for the District of Maryland; and (4) DPSCS Lieutenant Nina Riser.

[3] Although CDF is a facility for federal pre-trial detainees, it is managed by DPSCS pursuant to a contract with the USMS.

preventative actions advised by the Centers for Disease Control and Prevention (CDC) and Maryland Department of Health (MDH) regarding the disease.

DPSCS officials have substantial experience ensuring that viral outbreaks do not occur at their facilities. They recognize the unique threat posed by the transmission of viruses inside a jail, and longstanding policies and procedures already exist to ensure an outbreak does not occur of many serious diseases, such as HIV/AIDS, MRSA, sexually transmitted diseases, viral hepatitis, tuberculosis, and seasonal influenza. When faced with the potential for transmission of other notable viruses in recent history—such as, Avian Influenza (i.e., bird flu), H1N1, Severe Acute Respiratory Syndrome (i.e., SARS), and Ebola—DPSCS facilities, including CDF, did not suffer any outbreaks.

That being said, DPSCS recognizes that COVID-19 carries an increased risk of transmission; that COVID-19 carries a higher fatality rate than many other viruses; and that the COVID-19 situation has resulting in a state of emergency. Accordingly, DPSCS has employed the following measures at CDF[4]:

- *Social Visitation*. DPSCS has placed a temporary hold on all social visits, such as visits from friends and family, as well as all outside programming, to limit the number of people entering CDF and interacting with detainees.[5] Defense attorneys are still permitted to visit their clients in person; however, attorneys and detainees are separated by a glass wall and communicate with each other through the use of a telephone.

- *Detainees Entering the Facility*. Unlike many of DPSCS's facilities, which are needed to house the constant influx of new state arrestees, CDF houses federal detainees and, at this time, few federal detainees are entering CDF. The only new detainees entering CDF are a limited number of new arrestees who present a particular safety risk to the community and individuals already are in transit to the facility.

---

[4] Because the health situation is rapidly evolving, new policies and procedures at CDF are constantly being implemented.

[5] Due to the hardship this poses, DPSCS has given each detainee five free telephone calls per day to ensure that each detainee is able to remain in contact with friends and family members.

- *Screening Procedures.*  In the few instances in which a new detainee enters CDF, he will be housed in an intake facility for approximately one week, where he will be screened by medical professionals for coronavirus symptoms and exposure risk factors before being placed in the general population.

- *Detainee Movement.*  The Court's Second Amended Standing Order postponed all criminal trials scheduled to commence through April 24, 2020, and postponed all criminal proceedings through March 27, 2020.  Case No. 1:00-mc-0302, ECF No. 93 (filed Mar. 14, 2020).  This means that detainees will not need to leave CDF during this period for any court appearances, except for emergencies.  In the event that a detainee has a court appearance, he will be screened for symptoms before entering the transport van and, upon reaching the courthouse, his temperature will be taken twice via a forehead thermal reader to ensure he does not have a fever.  To further avoid the possibility of exposure, the USMS has issued a prohibition on prisoner transfers to the courthouse or elsewhere for proffers, including a prohibition on agent transport writs and Chief Judge Bredar memorandum requests that would permit agents to pick up prisoners from a facility.

- *Sanitation and Hygiene.*  Each detainee is in possession of his own supply of soap to wash his hands at any time throughout the day.  Moreover, CDF recently completed a $1.1 million shower renovation, as a result of which detainees may shower whenever they wish.  Signs and hand sanitizer have been posted throughout the facility, educating detainees and correctional officers about proper hygiene and encouraging them to wash their hands frequently.  The Secretary of DPSCS also has ordered that all facilities, including CDF, increase surface cleaning.  In addition to paid sanitation employees, CDF has trained a group of detainees whose full time job is constantly to disinfect and clean all surfaces that could be touched.

- *Quarantine.*  DPSCS is following the CDC guidelines regarding testing for COVID-19 and isolation of individuals with symptoms and/or risk exposure factors.  If a detainee exhibits flu-like symptoms or presents risk exposure factors, designated cells in a remote part of CDF have been set aside to serve as a quarantine area, where medical professionals can monitor those detainees.  Across the street from CDF is a DPSCS facility with "negative pressure rooms," where the ventilation is designed to avoid re-circulating air into the general population to limit the possibility of cross-contamination from room to room.

- *Correctional Officers.*  Although correctional officers will need to enter and re-enter the facility, they have received multiple mandatory trainings over the past week about how to mitigate the risk of exposing detainees to the disease.  Correctional officers have been ordered to stay home if they have any symptoms of the disease, and advanced paid leave will be provided for any employees who have not accrued sufficient paid leave, to disincentive sick employees from coming to work to avoid loss of pay.

Finally, in order to ensure that the Court remains apprised of these and other precautionary measures, the USMS has been in contact with Chief Judge Bredar.  The USMS has appointed Steven D. Akers, the former Assistant USMS Chief, to serve as a liaison with the Court, and to respond to any inquiries regarding conditions at CDF and the measures being taken in response to the COVID-19 situation.

### B.  Bailey's Medical Needs Are Adequately Being Addressed at CDF

Indeed, the defendant is paraplegic and suffers from numerous medical conditions, ECF 22 at 2, his medical needs are being met and safety measures are in place at CDF in the event of an outbreak.  When Bailey first was arrested and transported to CDF, he underwent an extensive intake process, whereby he was screened and examined by licensed medical professionals who are now fully apprised of his medical conditions.

By virtue of being in a detention facility, Bailey is in the presence of medical professionals at all times.  Each DPSCS facility has privatized medical doctors and nurses who monitor and provide care onsite to detainees who have chronic diseases, such as asthma, diabetes, and hypertension.  There are multiple points of access for detainees with asthma and other chronic diseases to seek medical care, whether for routine or emergency needs, including on-site dispensaries, infirmaries, and clinics that provide acute and chronic treatment for these types of illnesses.  Asthmatic detainees, such as the defendant, are permitted to keep their inhalers on their person, and have access to respiratory therapy treatments and oxygen onsite.  DPSCS also contracts with on-site pharmacists, who are available to help providers make the best recommendations for Asthma therapy and other chronic diseases.  In addition, clinical pharmacists are on call at all times, day or night.  If Bailey should need intensive treatment that cannot be provided inside CDF, there is a hospital located directly across the street from CDF to provide

non-emergency care and detainees are transported to community hospitals in the event of an emergency.

Between the medical professionals at CDF and the medical professionals at the hospitals, Bailey has access to all of the care that he needs. If Bailey needs treatment for asthma, or other illnesses, he will receive it. Even if Bailey becomes infected with COVID-19, he will be quarantined, monitored, and receive any needed treatment, consistent with the CDC guidelines. And, if Bailey needs specialized care for an unforeseen illness or injury, the medical staff at CDF will refer him to an outside professional. In short, there are sufficient resources, both inside and outside CDF, to ensure that Bailey's medical needs are addressed.

While the COVID-19 virus is new, health claims by detainees are not. Courts have generally recognized that "it is a rare case in which health conditions present an 'exceptional reason'" to allow for release where otherwise detention would be warranted. *United States v. Wages*, 271 Fed. App'x 726, 728 (10th Cir. 2008). These cases recognize that reasonably necessary treatments are available in prison, and often times a prison setting will provide superior care than a defendant can obtain on the outside. *United States v. Rodriguez*, 50 F. Supp. 2d 717, 722 (N.D. Ohio 1999). In this case, Bailey simply has not made a factual record that his needs will not be met while detained.

### III.    Releasing Defendants Like Bailey Would Place An Undue Burden on the Pretrial Services Office and the Courts

Bailey asks to reside with this mother and be subject to electronic monitoring. For the reasons discussed above, however, a combination of electronic monitoring and release conditions will not protect the public from a high-level drug trafficker with access to firearms and a history of poor performance under court supervision. Further, awarding such relief would place a

substantial and unwarranted burden on the Pretrial Services Division of the U.S. Probation Office, as well as the Court.

Whenever the Court orders electronic monitoring, a Location Monitoring ("LM") Specialist is appointed to oversee the Defendant's pretrial release. In the Northern Division, there are only two LM Specialists, each of whom currently handles approximately 30 cases.[6] To be sure, one case, by itself, would not strain the system. Yet if the Court released Bailey—a leader of a large scale DTO with a lengthy criminal record—then undoubtedly an avalanche of defendants would also seek release. Releasing such defendants would not only endanger the community; it would quickly stretch the bandwidth of existing LM specialists beyond its breaking point.[7]

The Magistrate Judges in this District, however, have repeatedly detained defendants like Bailey to protect the community *from them*. The speculative prospect of a COVID-19 outbreak at CDF does not diminish the public interest in keeping armed drug dealers off the streets. In light of the protective measures now in place at CDF, and given DPSCS's prior track record in avoiding viral outbreaks at their facilities, the specter of a COVID-19 outbreak is not a fire alarm that defendants can pull because they wish to get out of jail.

Lastly, on March 17, 2020, U.S. District Judge Paul Grimm of the United States District Court for the District of Maryland came to a similar conclusion in denying an appeal of a detention order in the case of *United States v. Martin*, No. CR PWG-19-140-13, 2020 WL 1274857, at *1 (D. Md. Mar. 17, 2020). In that case, the defendant appealed a pre-trial detention order, "citing

---

[6] This information was provided by W. Scott Smith, Deputy Chief U.S. Probation Officer.

[7] Before a Defendant is placed on release, a Pretrial Services Officer also must vet the proposed residence and meet the proposed third-party custodian and other residents who live there. A flood of release orders would force these Officers to conduct a substantial amount of *in-person*, *in-home* meetings, exposing them to a heightened risk of infection.

the circumstances regarding the COVID-19 pandemic as a reason for his release." *Id.* at 1. Defendant Martin, who was previously diagnosed with asthma, high blood pressure, and diabetes, is charged in a large-scale drug conspiracy where he faces a mandatory minimum sentence of ten years of incarceration. *Id*. The District Court concluded with regard to Martin's current medical conditions, that those conditions "alone [are] insufficient to rebut the proffer by the Government that the correctional and medical staff at CDC are implementing precautionary and monitoring practices sufficient to protect detainees from exposure to the COVID-19 virus." *Id.* at 8. In this case, Bailey, like Martin, cannot rebut the above government's proffer of the precautionary measures implemented by CDF.

In another appeal, U.S. District Judge Amit Mehta of the United States District Court for the District of Columbia recently affirmed Magistrate Judge Meriweather's detention order, relying at least in part on the fact that "[t]he Department of Corrections is taking precautions to protect the inmate population, and there is not any reported case within the inmate population (to the court's knowledge)." *United States v. Hill*, APM-19-260 (D.D.C.), Paperless Order date March 19, 2020.[8]

The continued detention of defendants like Dayon Bailey is necessary to ensure public safety and does not endanger public health.

---

[8] To the extent that the defendant relies on policy changes in State Courts or other jurisdictions, those policy changes are inapplicable to the defendant's case. For example, the Defendant cites a Daily Record article citing Baltimore State's Attorney Marilyn Mosby's directive to her staff to drop charges for non-violent crimes. *See* ECF 22 at 7 n. 24. However, the policy of the Baltimore State's Attorney to drop charges against non-violent offenders charged with simple possession, prostitution, trespassing, minor traffic offenses, open container, and public urination and other offenses simply has no relation to this Defendant who is charged with possessing a firearm while being prohibited and in furtherance of drug trafficking and who *fled* from prosecution for over one year.

**CONCLUSION**

For the foregoing reasons, the Court should deny Bailey's motion and order his continued detention pending trial.

Respectfully submitted,

Robert K. Hur
United States Attorney


/s/
Zachary Stendig
Assistant United States Attorney